CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

OCT 01 2009

JOHN F. CORCORAN, CLERK
BY: /s/ J. Justice
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| RMA LUMBER, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> PIONEER MACHINERY, LLC, ET AL., <br><br> *Defendants.* | CIVIL ACTION NO. 6:08-CV-00023 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

This matter is now before the Court upon consideration of the motion for summary judgment (docket no. 47) filed by defendant Pioneer Machinery, LLC ("Pioneer"). The matter has been fully briefed and argued. For the reasons stated herein, I will grant the motion.

### I. ALLEGATIONS OF THE ORIGINAL COMPLAINT

On June 6, 2006, RMA Lumber, Inc. ("RMA" or "Plaintiff") purchased a Peterson HC 6700B Grinder, S/N 31B-54-1305 (the "Grinder"). The Grinder is manufactured by one of the two co-defendants, Peterson Pacific Corp. ("Peterson"), and Plaintiff purchased it from the other co-defendant, Pioneer, through Pioneer's office in Glen Allen, Virginia. No written contract for the purchase and sale of the subject equipment (the "Equipment") was ever signed by Pioneer. In conversations prior to purchasing the Grinder, RMA informed Pioneer of the particular purposes for which the Equipment would be used and the intensity of such uses. Pioneer had sold grinders to RMA in the past, and Pioneer's salesmen had been at RMA work sites numerous times in the past. Pioneer was familiar with RMA's operations and the uses to which it would put the Equipment. RMA relied on Pioneer's skill and judgment to select or furnish goods suitable for RMA's purposes. The uses to which RMA intended to put and did put the

Equipment were within scope of the purposes it disclosed to Pioneer and were within the ordinary purposes for which such goods are used.

On or about June 6, 2006, Pioneer represented to RMA that the Equipment was capable of meeting RMA's specific needs, of which Pioneer had been made aware by RMA, and stated to RMA the following: that the Equipment operated at as high a capacity and speed as any other grinder on the market, and significantly higher than the Model 5400 Peterson grinder RMA had been using; that it would easily handle the material and volume RMA told them it needed to process; that it was designed to operate with an 8 inch screen; and that it operated at a high level of efficiency and reliability. Pioneer further represented that the Equipment would grind as fast as, handle as large a size of material as, and produce a higher quality product than the "Diamond Z" tub grinder. According to Plaintiff, Pioneer knew these representations to be false when it made them, because Pioneer was aware that, owing to a design defect in the Equipment, the Equipment would malfunction and be unable to handle the volume and rate of processing of material needed by RMA; the Equipment would not operate at as a high a capacity and speed as any other grinder on the market; the Equipment would not operate at a significantly higher capacity than the Model 5400 Peterson grinder RMA had been using; the Equipment would not operate with an 8 inch screen; and the Equipment would not operate at a high level of efficiency and reliability.

The alleged deficiencies in the Equipment included a design defect in the discharge conveyor motor. Pioneer had been notified by Peterson of the defect and had been provided by Peterson with a kit to retrofit the Equipment in such a manner as to cure the defect, but failed to install the retrofit prior to selling the Equipment to RMA, and did not notify RMA that a retrofit was needed. Plaintiff alleges that, on June 15, 2006, immediately after it began to use the

Equipment, the Equipment malfunctioned. Attempting to resolve the malfunction, RMA notified Pioneer of the problem repeatedly, beginning on June 15, 2006, but the malfunction continued. According to Plaintiff, Pioneer informed RMA that the problem was due to operator error, although Pioneer knew that the problem causing the malfunctioning was a design defect. RMA continued to attempt to use the Equipment until September 2007, even though it continued to malfunction. Plaintiff maintains that, as a result of this repeated malfunctioning, the Equipment operated so slowly that RMA lost many of its contracts and contractual expectancies. After 67 weeks of continuous malfunctioning, Pioneer retrofitted the small discharge conveyor motor on the Equipment with a larger motor. In Plaintiff's view, the retrofit should have taken only two days to complete, but Pioneer took six weeks, ultimately completing the retrofit on October 15, 2007. Since the retrofit, the Equipment appears to be working properly. RMA claims that, as a direct and proximate result of the defective condition of the Equipment, it has been damaged in the amount of no less than $1,691,853.45.

## II. Amended Complaint

Having completed a protracted discovery process, and facing Pioneer's motion for summary judgment, RMA amended its complaint, in effect dismissing the following counts previously pleaded against Pioneer -- actual fraud, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose -- and its request for punitive damages against Pioneer. The only count remaining against Pioneer alleges constructive fraud.

The factual allegations in the amended complaint have been stated to conform to the evidence disclosed in discovery. Since at least the year 2000, RMA has been engaged in the removal and clearing of timber for construction projects. During that time, RMA has purchased

-3-

numerous machines manufactured and assembled by Peterson. Each of these machines was purchased through Pioneer, Peterson's authorized dealer in the Central Virginia region. Immediately prior to the purchase of the Grinder, RMA was running a Peterson 5400 Grinder. As RMA began to get contracts on larger and larger clearing and timber jobs, it found the 5400 inadequate in power and size to its needs.

In the course of investigating larger, more powerful grinders, Rickie Allen, vice-president of RMA, travelled to the showroom of Pioneer's Glen Allen, Virginia location to inquire about the Peterson 6700B grinder. Pioneer employed a salesman, Richard Wiltshire, who specialized in the sales of the Peterson grinders. Mr. Allen and Mr. Wiltshire already knew each other, having first met in 2003 when Mr. Wiltshire was selling Diamond-Z grinders for Tri-State Process Equipment Co. Mr. Wiltshire told Mr. Allen about the capabilities of the Peterson 6700B grinder, including its ability to grind as much as any tub grinder, such as the Diamond-Z grinder, and the great success a number of companies in Florida and Georgia were having using the grinder. Mr. Wiltshire also gave Mr. Allen the manufacturer's technical specifications sheet on the Peterson 6700B grinder. Mr. Wiltshire told Mr. Allen that no one was experiencing any problems with their machines. In addition, Mr. Wiltshire agreed to demonstrate the machine for Mr. Allen and RMA.

In the early part of May 2006, Mr. Wiltshire and a service technician[1] from Pioneer brought the Peterson HC 6700B Grinder, S/N 31B- 54-1305 to an RMA job-site in Goochland County. Joe Jacobsen, the Peterson sales representative who covered Central Virginia, was also present for at least part of the demonstration. Mr. Wiltshire instructed employees of RMA on

---

[1] On Plaintiff's information and belief, Daniel Haden.

-4-

Case 6:08-cv-00023-NKM-mfu   Document 86   Filed 10/01/09   Page 4 of 14   Pageid#: 1342

the use of the Grinder, and then informed Mr. Allen that he, Mr. Allen, should begin feeding material into the Grinder. Mr. Allen did so, and the material he fed into the Grinder included several large stumps that he had not cleaned or broken down, given that the grinding of such material was the primary reason RMA was considering buying a larger and more powerful grinder. Several times during the demonstration, the machine clogged up and stalled. Each time, Mr. Wiltshire told the RMA employees that it was just a matter of modifying the factory presets and adjusting the computer feed controls. Although the machine stalled several times during the demonstration, RMA decided nevertheless to purchase the Grinder, relying on the representations of Mr. Wiltshire and Mr. Jacobsen that the problems could be corrected by minor computer adjustments, which could be performed in the field.

On May 23, 2006, RMA purchased the Peterson Grinder from Pioneer through its Glen Allen, Virginia office. RMA experienced problems with the Grinder from the beginning. From June 2006 until the summer of 2007, RMA was unable to run the machine for more than an hour without it clogging or stalling. RMA was unable to process large stumps, or grind damp or wet material. Particularly when wet material was placed into the feeder, the machine would shortly thereafter stall out. RMA telephoned Richard Wiltshire and David Tulloh, Pioneer's service supervisor, on a regular basis to report these difficulties, complaining that the discharge conveyor system stopped and stalled. Although Pioneer sent service representatives to RMA jobsites on more than one occasion, it was unable to observe or replicate the problem. Pioneer made a number of "troubleshooting" efforts. For instance, on one occasion when a Pioneer service technician was able to observe the problem with the discharge conveyor, they thought it was a problem with the wiring, for which they replaced the wiring connection. Unfortunately, none of their efforts was able to rectify the problems, which RMA continued to experience.

-5-

Case 6:08-cv-00023-NKM-mfu   Document 86   Filed 10/01/09   Page 5 of 14   Pageid#: 1343

RMA continued to bring the Grinder to job-sites, but was unable to run it for more than 2 hours at a time, forcing RMA to rely on the smaller, less powerful 5400 grinder as a stopgap measure. Plaintiff alleges that, as a result, it was unable to complete its jobs in a timely fashion, initially losing money on jobs and ultimately finding itself unable to match competitors' bid prices, and this situation placed RMA in great economic stress.

Prior to the summer of 2007, Mr. Allen also spoke to Mr. Jacobsen on a number of occasions, reporting that he was experiencing problems with the Grinder. During the summer of 2007, RMA placed a call to David Tulloh at Pioneer requesting service and reporting that the problems with the discharge conveyor system persisted. At this point, Mr. Tulloh initiated a discussion with Brian Gray, who was then Pioneer's Virginia Product Support Manager, regarding the problems RMA was continuing to experience with the Grinder. Mr. Gray called Jim Prior, Peterson's Corporate Service Manager, and related to Mr. Prior the problems RMA had been experiencing since its purchase of the Grinder on May 23, 2006.

Plaintiff's amended complaint states that, unbeknownst to either RMA or Pioneer, by May 23, 2006, Peterson was already aware that other 6700Bs were experiencing problems nearly identical to those being experienced by RMA. According to Plaintiff, Peterson had learned no later than May 24, 2005, that the 6700B discharge conveyor would stall when it was heavily loaded with wet, green waste. Evidently, production units number 1 through 66 of the Model 6700B were originally manufactured with a Charlynn motor to power the discharge conveyor system. This was the same motor which was used on the smaller, less powerful Model 5400 grinder. The Model 6700B grinder RMA purchased was production unit number 54. Initially, the engineers assigned to the 6700B team attempted to increase the pressure of the Charlynn to increase the torque on the discharge conveyor, which would allow the conveyor belt

-6-

to carry more weight without stalling. Unfortunately, Peterson found that even increasing the torque did not correct this problem, and began to investigate replacing the Charlynn motor with a larger, more powerful Poclain motor. Peterson sent Tom Le, one of its engineers on the 6700B team, to New Jersey to test the Poclain motor in the field. When the field tests came back positive, Peterson decided no later than November 20, 2006, to manufacture all future 6700B grinders, beginning with production unit number 67, with the larger, more powerful Poclain motor. Peterson also began retrofitting some of the already manufactured 6700B grinders with the larger, more powerful Poclain motor.

On May 9, 2006, Peterson issued Temporary Manufacturing Deviation #1147 ("TMD1147"). A temporary manufacturing deviation is the process by which Peterson records the parts and processes involved in an engineering change such as the replacement of the Charlynn motor by the Poclain motor. This allows the temporary manufacturing deviation to be replicated on other machines in the same line. TMD1147 was initially issued for production unit number 4, which had been experiencing problems with the discharge conveyor system stalling out when loaded with heavy, wet waste. TMD1147 was eventually expanded to at least 3 other 6700B grinders. In addition, no later than December 22, 2006, Peterson created a "parts kit" for TMD1147, which could be ordered by its authorized dealers and service representatives for installation on other machines. At least one authorized dealer ordered a TMD1147 parts kit for a grinder, production unit number 45, which was not listed on any of the revisions of TMD1147. Although Peterson was repeatedly forced to expand TMD1147 to multiple 6700B grinders, A service bulletin is the process by which Peterson normally notifies its authorized service representatives of needed corrective action or repairs that affects multiple production models across a particular product line. Peterson never issued to any of its authorized service

representatives a service bulletin regarding TMD1147. Peterson issued no fewer than five other service bulletins involving other problems for production models within the 6700B grinder line.

During the previously mentioned conversation between Mr. Prior and Mr. Gray in the summer of 2007, Mr. Prior told Mr. Gray that Peterson had a solution to the problems RMA had been experiencing, the TMD1147 parts kit. Although the RMA Grinder was well outside of warranty, Peterson agreed to provide the TMD1147 parts kit at no charge. Pioneer installed the parts kit, including the larger, more powerful Poclain motor, on RMA's Grinder. After the installation, the Equipment appeared to work properly. However, RMA alleges that, because of an at-least-15-month delay between 1) Peterson having discovered a solution to the problem of the underpowered discharge conveyor system and 2) when it informed Pioneer and RMA of this solution, RMA had already suffered severe economic distress and was unable to maintain payments on the Grinder. It was ultimately lost to foreclosure and auctioned off. Bank of the West, with whom the grinder was financed, now seeks $490,178.43 as the deficiency due. RMA states that, as a direct and proximate result of the defective condition of the equipment, RMA has been damaged in no less than the following amounts:

| | | |
|---|---|---|
| a. | Purchase price | $ 615,000.00 |
| + | | |
| b. | Financing charges and interest on funds borrowed for equipment purchase | $ 170,853.45 |
| | Total | $ 785,853.45 |

Pleading constructive fraud against Pioneer, Plaintiff states that, in the course of selling the Grinder to RMA, Richard Wiltshire and other employees of Pioneer made representations that the 6700B was more powerful than the Peterson 5400 grinder, and that it would be able to

-8-

Case 6:08-cv-00023-NKM-mfu   Document 86   Filed 10/01/09   Page 8 of 14   Pageid#: 1346

grind larger stumps and a greater volume of material, in addition to other representations regarding the Grinder set forth above. However, because of the underpowered nature of the discharge conveyor system as originally manufactured, these representations were not true. These misrepresentations were material in RMA's decision to purchase the Grinder. RMA alleges that, although these misrepresentations were made innocently or negligently, RMA relied on them in their decision to purchase the Grinder, and was therefore damaged by them. According to RMA, Pioneer's actions constitute constructive fraud in the inducement for which Pioneer is liable to RMA for its damages.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986).

### IV. DISCUSSION

#### A. Statute of Limitations

In Pioneer's reply to Plaintiff's response to Pioneer's motion for summary judgment, Pioneer raises, for the first time, the statute of limitations as an affirmative defense. In its original complaint, Plaintiff stated that it had purchased the Grinder from Pioneer on June 6, 2006. Discovery indicates that Plaintiff purchased the Grinder on May 23, 2006, and Plaintiff's amended complaint corrects this inaccuracy. Pioneer alleges that the complaint was originally filed on June 6, 2008, and therefore was not timely filed, because in Virginia a claim for constructive fraud must be filed within two years from the date when the fraud is discovered or

by the exercise of diligence reasonably should have been discovered. *See* Va. Code § 8.01-243(A) and § 8.01-249(1).

Although Pioneer contends that Plaintiff has been in possession of documents indicating that the actual purchase date was May 23, 2006, Plaintiff counters that Pioneer has been in possession of these same documents, and yet Pioneer waited to raise any argument regarding the statute of limitations until filing its reply. An argument not raised in an initial brief is considered waived. *U.S. v. Brower*, 336 F.3d 274, n. 2 (4th Cir. 2003) (citing *Carter v. Lee*, 283 F.3d 240, 252 n. 11 (4th Cir. 2002) ("[a]n issue first argued in a reply brief is not properly before [the Court]")); *see also Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n. 2 (4th Cir. 1996).

Nonetheless, assuming *arguendo* that the defense has not been waived, the cause of action for fraud did not necessarily begin to run on May 23, 2006, the date of purchase. Virginia has adopted the majority rule that the statute of limitations for fraud does not begin to run until the fraud "is discovered or by the exercise of due diligence reasonably should have been discovered." Va. Code § 8.01-249(1); *see also Hansen v. Stanley Martin Companies, Inc.*, 266 Va. 345 (2003). Thus, it is appropriate to question when Plaintiff discovered or should have discovered that the representations made by Pioneer were false. Pioneer argues that the claim accrued on the date of purchase because Mr. Allen was unhappy with the machine almost from the beginning. However, this does not indicate that Mr. Allen or anyone else at RMA were aware about the misrepresentations or had any knowledge about the defect in the discharge conveyor system. In fact, the evidence suggests that Plaintiff "kept searching for answers" to the problems with the Grinder. *Peter Farrell Supercars, Inc., v. Monsen*, 82 Fed. Appx. 293 (4th Cir. 2003), *cert. denied*, 541 U.S. 1064 (2004). Although the evidence suggests that Plaintiff was unhappy with the Grinder almost from the beginning, it also suggests that Plaintiff was

diligent in attempting to discover the problem, but did not learn of TMD1147 and the upgrade kit until the summer of 2007. Accordingly, this action was timely filed on June 6, 2008.

## B. Constructive Fraud

Pioneer argues that there was no reasonable reliance because RMA had a duty to investigate, which it failed to do, and because the economic loss rule prevents Plaintiff's claim for constructive fraud.

### 1. Reasonable Reliance

In Virginia, the elements of a cause of action for constructive fraud are as follows: (1) a false representation of a material fact; (2) made innocently or negligently; (3) in such a way as to induce a reasonable person to believe it; (4) with the intent that the person will act upon this representation; (5) and upon which the injured party relied; (6) to its detriment. *See, e.g., Prospect Development Company, Inc. v. Bershader*, 258 Va. 75 (1999).[2] Pioneer challenges whether RMA's reliance on any statement made by Pioneer was reasonable in light of RMA having used the machine in a demonstration and having observed the clogging and stalling of the Grinder. Pioneer argues that, having observed the very problem it would later complain of, RMA's "failure to conduct a full investigation precluded any claim of justifiable reliance."[3] In support of this contention, Pioneer relies on *Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039 (4th Cir. 1987). In *Hoover*, the Court observed that not only should the plaintiff have

---

[2] For comparison, under Virginia law the elements of fraud (as opposed to constructive fraud) are as follows: (1) a false representation of material fact, (2) made intentionally and knowingly, (3) with the intent to mislead, (4) reliance by the party misled, and (5) resulting damage to the misled party. *See Tidewater Beverage Services, Inc. v. Coca Cola, Inc.*, 907 F. Supp. 943, 946 (E.D. Va. 1995); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 346-47 (Va. 1998). *See also* note 5, *infra*.

[3] Defendant also asserts that there is no damage resulting from the alleged reliance, because Plaintiff would have had to pay interest and finance charges regardless of whether the Grinder operated to its satisfaction.

-11-

"made a prudent investigation, it expressly agreed in . . . the contract that it would 'inspect' and 'become familiar' with the [product]." The Court also observed "that a timely investigation would have revealed the error." *Id.* at 1044. According to Pioneer, once Plaintiff observed the clogging or stalling, it was under an obligation to investigate the problem. Pioneer's discussions of constructive fraud and *Hoover* omit that the duty to investigate is overcome if the seller's conduct diverts the buyer from engaging in further inquiry. *Id.*; *see also Armentrout v. French*, 220 Va. 458, 467 (1979) (the duty to investigate is relieved if the seller "say[s] or do[es] anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make." Here, after Mr. Allen observed the machinery stalling, he asked Richard Wiltshire, the salesman for Pioneer, what was causing the problem. Mr. Wiltshire assured him that it was simply an issue of getting the machine settings right, including adjusting the feed settings and getting the feed computer dialed in. Mr. Wiltshire further assured Mr. Allen that if RMA continued to have any problems, Pioneer's service department would be able to take care of it. Given the evidence, none of this was apparently true. Once Mr. Wiltshire and others informed Mr. Allen that the problems with the Grinder were simply a matter of minor adjustments, their conduct diverted RMA from engaging in any further inquiry that might have disclosed a design defect. Moreover, Plaintiff subsequently did engage in further inquiries, but did not learn of the solution until a year later.

### 2. *Economic Loss Rule*

Pioneer contends also that the constructive fraud claim is barred by the economic loss rule because the claim is solely for economic damages resulting from an alleged product defect. I agree. As explained in *Waytec Elecs. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 491 (W.D. Va. 2006),

losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts. The [economic loss] rule prevents a plaintiff from recovering purely economic losses in a tort action by simply recasting a contract claim as a tort claim.

(Internal quotations and citations omitted); *see also Virginia Transformer Corp. v. P. D. George Co.*, 932 F. Supp. 156, 162-63 (W.D. Va. 1996) ("Constructive fraud is effectively nothing more than a claim of negligence. Carried to its logical conclusion it would emasculate the economic loss rule.").

Plaintiff asserts that it purchased the Grinder in reliance upon Pioneer's representations as to the Grinder's capability, and that, "[i]n other words, RMA was fraudulently induced into buying the [Grinder] by Pioneer's innocent misrepresentations of its capabilities." According to Plaintiff, "the Amended Complaint . . . clarifies that it seeks damages only for the amount paid for the machine, the interest paid on the financing of the purchase and any other penalties or costs associated with the financing. *These are in the nature of rescission.*" (Emphasis added.) Pioneer points out that the problem with Plaintiff's assertion that the damages it seeks "are in the nature of rescission" is that neither the original complaint nor the amended complaint seek rescission as a remedy. Rescission would entail unwinding the transaction by allowing Plaintiff to return the Grinder for a refund of the sale price; this, however, is an impossibility. Instead, Plaintiff requests money damages "for the amount paid for the machine" -- an amount that it has never laid out in full, the machine having been foreclosed upon and auctioned off -- plus interest and financing costs. Thus, the damages RMA seeks are, in fact, more "in the nature of"

Case 6:08-cv-00023-NKM-mfu Document 86 Filed 10/01/09 Page 13 of 14 Pageid#: 1351

economic losses, rather than "in the nature of rescission," and are not recoverable in a tort action for constructive fraud.[4]

### V. CONCLUSION

For the heretofore stated reasons, Pioneer's motion for summary judgment (docket no. 47) will be granted, and Pioneer will be terminated as a defendant in this action.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this ____ day of October, 2009.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[4] RMA states that it "was fraudulently induced into buying the [Grinder] by Pioneer's innocent misrepresentations of its capabilities." Plaintiff maintains that, in Virginia, rescission is a remedy for fraudulent inducement, even when the inducement is "constructive." However, while it is true that, in Virginia, "[c]onstructive fraud is a ground for rescission in equity, even when based upon false representations innocently made," *Bergmueller v. Minnick*, 238 Va. 332 (1989), a cause of action for fraudulent inducement is not the same thing as a cause of action for "constructive fraud." As already observed, constructive fraud is a tort claim of negligence, actionable upon "false representations innocently made." *Id.* A constructive fraud claim of a false representation innocently or negligently made cannot be reconciled with the elements of fraud in the inducement, specifically a false representation of material fact, made intentionally and knowingly, with the intent to mislead. *See* note 2, *supra*; *see also Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (constructive fraud has the same elements as actual fraud except "the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently"). In any event, "constructive fraud in the inducement," which Plaintiff claims, is not an intentional tort under Virginia's economic loss rule, *Virginia Transformer*, 932 F. Supp. at 162, and under the economic loss rule, a plaintiff cannot recover for a purely economic loss except in the case of an intentional tort, *Richmond v. Madison Mgmt. Group*, 918 F.2d 438, 446-47 (4th Cir. 1990).

-14-