CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

NOV 1 9 2009

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

|  |  |
|---|---|
| RMA LUMBER, INC., | CIVIL ACTION NO. 6:08-CV-00023 |
| *Plaintiff,* |  |
| v. | **MEMORANDUM OPINION** |
| PIONEER MACHINERY, LLC, ET AL., |  |
| *Defendants.* | JUDGE NORMAN K. MOON |

This matter is now before the Court upon consideration of motions for summary judgment (docket nos. 41 & 82) filed by defendant Peterson Pacific Corp. ("Peterson"). The matter has been fully briefed and the parties' oral arguments were heard on October 26, 2009. For the reasons stated herein, Peterson's motions for summary judgment (docket nos. 41 and 82) will be granted.

## I. PLAINTIFF'S ALLEGATIONS

### A. The Original Complaint

On June 6, 2006, RMA Lumber, Inc. ("RMA" or "Plaintiff") purchased a Peterson HC 6700B Grinder, S/N 31B-54-1305 (the "Grinder").[1] The Grinder is manufactured by one of the two co-defendants, Peterson Pacific Corp. ("Peterson"), and Plaintiff purchased it from a former

---

[1] The parties interchangeably -- and somewhat imprecisely -- refer to the machinery as the "Recycler." As I will attempt to make clearer *infra*, the machinery comprises two significant, and separate, components: first, a hammermill sort of contraption that grinds up the material that is fed into it and then spits the ground-up material out through a screened aperture; and second, a discharge conveyor belt system that carries the ground-up material away from the screened opening. Although the parties' imprecision in referring to the "Grinder" and the "Recycler" might suggest that the performance of the hammermill is at issue in this case, that is not so; rather, the performance of the discharge conveyor belt system is actually at issue.

co-defendant in this action, Pioneer Machinery, LLC ("Pioneer"),[2] through Pioneer's office in Glen Allen, Virginia. No written contract for the purchase and sale of the subject equipment (the "Equipment") was ever signed by Pioneer. In conversations prior to purchasing the Grinder, RMA informed Pioneer of the particular purposes for which the Equipment would be used and the intensity of such uses. Pioneer had sold grinders to RMA in the past, and Pioneer's salesmen had been at RMA work sites numerous times in the past. Pioneer was familiar with RMA's operations and the uses to which it would put the Equipment. RMA relied on Pioneer's skill and judgment to select or furnish goods suitable for RMA's purposes. The uses to which RMA intended to put and did put the Equipment were within scope of the purposes it disclosed to Pioneer and were within the ordinary purposes for which such goods are used.

On or about June 6, 2006, Pioneer represented to RMA that the Equipment was capable of meeting RMA's specific needs, of which Pioneer had been made aware by RMA, and stated to RMA the following: that the Equipment operated at as high a capacity and speed as any other grinder on the market, and significantly higher than the Model 5400 Peterson grinder RMA had been using; that it would easily handle the material and volume RMA told them it needed to process; that it was designed to operate with an 8 inch screen; and that it operated at a high level of efficiency and reliability. Pioneer further represented that the Equipment would grind as fast as, handle as large a size of material as, and produce a higher quality product than the "Diamond Z" tub grinder. According to Plaintiff, Pioneer knew these representations to be false when it made them, because Pioneer was aware that, owing to a design defect in the Equipment, the

---

[2] On June 29, 2009, plaintiff filed a motion to amend its complaint, which was granted on July 13, 2009. The amended complaint dismissed the following counts previously pleaded against Pioneer -- actual fraud, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose -- and its request for punitive damages against Pioneer. The only count remaining against Pioneer alleged constructive fraud, and was dismissed by Memorandum Opinion and Order entered on October 1, 2009. *See also* n. 3, *infra*.

Equipment would malfunction and be unable to handle the volume and rate of processing of material needed by RMA; the Equipment would not operate at as a high a capacity and speed as any other grinder on the market; the Equipment would not operate at a significantly higher capacity than the Model 5400 Peterson grinder RMA had been using; the Equipment would not operate with an 8 inch screen; and the Equipment would not operate at a high level of efficiency and reliability.

The alleged deficiencies in the Equipment included a design defect in the discharge conveyor motor. Pioneer had been notified by Peterson of the defect and had been provided by Peterson with a kit to retrofit the Equipment in such a manner as to cure the defect, but failed to install the retrofit prior to selling the Equipment to RMA, and did not notify RMA that a retrofit was needed. Plaintiff alleges that, on June 15, 2006, immediately after it began to use the Equipment, the Equipment malfunctioned. Attempting to resolve the malfunction, RMA repeatedly notified Pioneer of the problem, beginning on June 15, 2006, but the malfunction continued. According to Plaintiff, Pioneer informed RMA that the problem was due to operator error, although Pioneer knew that the problem causing the malfunctioning was a design defect. RMA continued to attempt to use the Equipment until September 2007, even though it continued to malfunction. Plaintiff maintains that, as a result of this repeated malfunctioning, the Equipment operated so slowly that RMA lost many of its contracts and contractual expectancies. After 67 weeks of continuous malfunctioning, Pioneer retrofitted the small discharge conveyor motor on the Equipment with a larger motor. In Plaintiff's view, the retrofit should have taken only two days to complete, but Pioneer took six weeks, ultimately completing the retrofit on October 15, 2007. Since the retrofit, the Equipment appears to be working properly. RMA

claims that, as a direct and proximate result of the defective condition of the Equipment, it has been damaged in the amount of no less than $1,691,853.45.

## B. The Amended Complaint

Having completed a protracted discovery process, and facing pending motions for summary judgment, RMA amended its complaint, leaving only one count against Pioneer, alleging constructive fraud, which has since been dismissed.[3] The amended complaint removed the claim against Peterson alleging a breach of the implied warranty of merchantability; accordingly, summary judgment is appropriate as to that claim, and for that reason Peterson's first motion for summary judgment (docket no. 41) will be granted. However, RMA's amended complaint asserts the following new causes of action against Peterson: breach of express warranty; rescission of the limited warranty policy; and failure to warn that the 6700B models fitted with the Char-Lynn motor were "underpowered" and subject to stalling under heavy loads. The amended complaint also requests an award of punitive damages.

The factual allegations in the amended complaint have been stated to better conform with the evidence disclosed in discovery. Since at least the year 2000, RMA has been engaged in the removal and clearing of timber for construction projects. During that time, RMA has purchased numerous machines manufactured and assembled by Peterson. Each of these machines was purchased through Pioneer, Peterson's authorized dealer in the Central Virginia region. Immediately prior to the purchase of the Grinder, RMA was running a Peterson 5400 Grinder.

---

[3] The amended complaint dismissed the following counts previously pleaded against Pioneer -- actual fraud, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose -- and its request for punitive damages against Pioneer. The only count remaining against Pioneer alleged constructive fraud, and was dismissed by Memorandum Opinion and Order entered on October 1, 2009. *See also* n. 2, *supra*.

As RMA began to get contracts on larger and larger clearing and timber jobs, it found the 5400 inadequate in power and size to its needs.

In the course of investigating larger, more powerful grinders, Rickie Allen, vice-president of RMA, travelled to the showroom of Pioneer's Glen Allen, Virginia location to inquire about the Peterson 6700B grinder. Pioneer employed a salesman, Richard Wiltshire, who specialized in the sales of the Peterson grinders. Mr. Allen and Mr. Wiltshire already knew each other, having first met in 2003 when Mr. Wiltshire was selling Diamond-Z grinders for Tri-State Process Equipment Co. Mr. Wiltshire told Mr. Allen about the capabilities of the Peterson 6700B grinder, including its ability to grind as much as any tub grinder, such as the Diamond-Z grinder, and the great success a number of companies in Florida and Georgia were having using the grinder. Mr. Wiltshire also gave Mr. Allen the manufacturer's technical specifications sheet on the Peterson 6700B grinder. Mr. Wiltshire told Mr. Allen that no one was experiencing any problems with their machines. In addition, Mr. Wiltshire agreed to demonstrate the machine for Mr. Allen and RMA.

In the early part of May 2006, Mr. Wiltshire and a service technician[4] from Pioneer brought the Peterson HC 6700B Grinder, S/N 3lB- 54-1305 to an RMA job-site in Goochland County. Joe Jacobsen, the Peterson sales representative who covered Central Virginia, was also present for at least part of the demonstration. Mr. Wiltshire instructed employees of RMA on the use of the Grinder, and then informed Mr. Allen that he, Mr. Allen, should begin feeding material into the Grinder. Mr. Allen did so, and the material he fed into the Grinder included several large stumps that he had not cleaned or broken down, given that the grinding of such

---

[4] On Plaintiff's information and belief, Daniel Haden.

material was the primary reason RMA was considering buying a larger and more powerful grinder. Several times during the demonstration, the machine clogged up and stalled. Each time, Mr. Wiltshire told the RMA employees that it was just a matter of modifying the factory presets and adjusting the computer feed controls. Although the machine stalled several times during the demonstration, RMA decided nevertheless to purchase the Grinder, relying on the representations of Mr. Wiltshire and Mr. Jacobsen that the problems could be corrected by minor computer adjustments, which could be performed in the field.

On May 23,2006, RMA purchased the Peterson Grinder from Pioneer through its Glen Allen, Virginia office. RMA experienced problems with the Grinder from the beginning. From June 2006 until the summer of 2007, RMA was unable to run the machine for more than an hour without it clogging or stalling. RMA was unable to process large stumps, or grind damp or wet material. Particularly when wet material was placed into the feeder, the machine would shortly thereafter stall out. RMA telephoned Richard Wiltshire and David Tulloh, Pioneer's service supervisor, on a regular basis to report these difficulties, complaining that the discharge conveyor system stopped and stalled. Although Pioneer sent service representatives to RMA jobsites on more than one occasion, it was unable to observe or replicate the problem. Pioneer made a number of "troubleshooting" efforts. For instance, on one occasion when a Pioneer service technician was able to observe the problem with the discharge conveyor, they thought it was a problem with the wiring, for which they replaced the wiring connection. Unfortunately, none of their efforts was able to rectify the problems, which RMA continued to experience. RMA continued to bring the Grinder to job-sites, but was unable to run it for more than 2 hours at a time, forcing RMA to rely on the smaller, less powerful 5400 grinder as a stopgap measure. Plaintiff alleges that, as a result, it was unable to complete its jobs in a timely fashion, initially

losing money on jobs and ultimately finding itself unable to match competitors' bid prices, and this situation placed RMA in great economic stress.

Prior to the summer of 2007, Mr. Allen also spoke to Mr. Jacobsen on a number of occasions, reporting that he was experiencing problems with the Grinder. During the summer of 2007, RMA placed a call to David Tulloh at Pioneer requesting service and reporting that the problems with the discharge conveyor system persisted. At this point, Mr. Tulloh initiated a discussion with Brian Gray, who was then Pioneer's Virginia Product Support Manager, regarding the problems RMA was continuing to experience with the Grinder. Mr. Gray called Jim Prior, Peterson's Corporate Service Manager, and related to Mr. Prior the problems RMA had been experiencing since its purchase of the Grinder on May 23, 2006.

Plaintiff's amended complaint states that, unbeknownst to either RMA or Pioneer, by May 23, 2006, Peterson was already aware that other 6700Bs were experiencing problems nearly identical to those being experienced by RMA. According to Plaintiff, Peterson had learned no later than May 24, 2005, that the 6700B discharge conveyor would stall when it was heavily loaded with wet, green waste. Evidently, production units number 1 through 66 of the Model 6700B were originally manufactured with a Char-Lynn motor to power the discharge conveyor system. The Char-Lynn motor was also used on the smaller, less powerful Model 5400 grinder. The Model 6700B grinder RMA purchased was production unit number 54. Initially, the engineers assigned to the 6700B team attempted to increase the pressure of the Char-Lynn to increase the torque on the discharge conveyor, which would allow the conveyor belt to carry more weight without stalling. Unfortunately, Peterson found that even increasing the torque did not correct this problem, and began to investigate replacing the Char-Lynn motor with a larger, more powerful Poclain motor. Peterson sent Tom Le, one of its engineers on the

6700B team, to New Jersey to test the Poclain motor in the field. When the field tests came back positive, Peterson decided no later than November 20, 2006, to manufacture all future 6700B grinders, beginning with production unit number 67, with the larger, more powerful Poclain motor. Peterson also began retrofitting some of the already manufactured 6700B grinders with the larger, more powerful Poclain motor.

On May 9, 2006, Peterson issued Temporary Manufacturing Deviation #1147 ("TMD1147"). A temporary manufacturing deviation is the process by which Peterson records the parts and processes involved in an engineering change such as the replacement of the Char-Lynn motor by the Poclain motor. This allows the temporary manufacturing deviation to be replicated on other machines in the same line. TMD1147 was initially issued for production unit number 4, which had been experiencing problems with the discharge conveyor system stalling out when loaded with heavy, wet waste. TMD1147 was eventually expanded to at least 3 other 6700B grinders. In addition, no later than December 22, 2006, Peterson created a "parts kit" for TMD1147, which could be ordered by its authorized dealers and service representatives for installation on other machines. At least one authorized dealer ordered a TMD1147 parts kit for a grinder, production unit number 45, which was not listed on any of the revisions of TMD1147. Although Peterson was repeatedly forced to expand TMD1147 to multiple 6700B grinders, A service bulletin is the process by which Peterson normally notifies its authorized service representatives of needed corrective action or repairs that affects multiple production models across a particular product line. Peterson never issued to any of its authorized service representatives a service bulletin regarding TMD1147. Peterson issued no fewer than five other service bulletins involving other problems for production models within the 6700B grinder line.

During the previously mentioned conversation between Mr. Prior and Mr. Gray in the summer of 2007, Mr. Prior told Mr. Gray that Peterson had a solution to the problems RMA had been experiencing, the TMD1147 parts kit. Although the RMA Grinder was well outside of warranty, Peterson agreed to provide the TMD1147 parts kit at no charge. Pioneer installed the parts kit, including the larger, more powerful Poclain motor, on RMA's Grinder. After the installation, the Equipment appeared to work properly. However, RMA alleges that, because of an at-least-15-month delay between 1) Peterson having discovered a solution to the problem of the underpowered discharge conveyor system and 2) when it informed Pioneer and RMA of this solution, RMA had already suffered severe economic distress and was unable to maintain payments on the Grinder. Ultimately, the Grinder was lost to foreclosure and auctioned off. Bank of the West, with whom the grinder was financed, now seeks $490,178.43 as the deficiency due. RMA states that, as a direct and proximate result of the defective condition of the equipment, RMA has been damaged in no less than the following amounts:

| | | |
|---|---|---|
| a. | Purchase price | $ 615,000.00 |
| + | | |
| b. | Financing charges and interest on | |
| | funds borrowed for equipment purchase | $ 170.853.45 |
| | Total | $ 785.853.45 |

Pleading breach of express warranty against Peterson, Plaintiff acknowledges that, as part of the purchase of the Grinder, RMA was presented with a Limited Warranty Policy (the "Warranty"), which Mr. Allen signed on RMA's behalf. The Warranty limits Peterson's liability to the replacement of parts and the technician service for replacement. However, the Warranty also states that the "Peterson product is warranted to be free from defects in workmanship and

materials under normal use and conditions." According to Plaintiff, Peterson was aware of the defect within the discharge conveyor system "[a]t the time Peterson induced RMA (via Pioneer) to sign [the] Warranty," and that, although Peterson "was aware that TMD1147 was the only way to cure [the] defect within the discharge conveyor system, Peterson did not inform RMA or Pioneer of TMD1147 until the summer of 2007," and "did not furnish replacement parts or technician service for the . . . Grinder until 15 months after RMA purchased the Grinder, after the expiration of the Warranty period." Plaintiff maintains that Peterson "anticipatorily breached" the Warranty "[b]y failing to notify Pioneer or RMA of the defect in the discharge system prior" to the purchase, and further "breached the Warranty by failing to furnish the replacement parts or technician service for the only cure for the defect of which it was aware until after the expiration of the Warranty." In Plaintiff's view, "[b]ecause of the foregoing breaches, Peterson cannot rely on the terms of the Warranty to limit its liability. . . ."

Pleading rescission, RMA states that, "[i]n exchange for a limitation on its liability under all other express or implied warranties, Peterson promised both that the machine was free from defects and that, if any defects were found and reported within the warranty period, it would furnish replacement parts and technician service." Plaintiff adds that, prior to its purchase of the 6700B, Peterson was aware of the defect in the machine, yet did not notify RMA or Pioneer of the defect, did not "provide the replacement parts or technician service it knew to be the only cure for the defect," and "continued to fail to notify Pioneer or RMA of the defects for 15 months, until the Warranty had expired and Pioneer had contacted Peterson to enquire about the problems RMA was experiencing. . . ." In Plaintiff's view, "Peterson's lack of performance

under the Warranty constitutes a substantial failure of consideration for the Warranty," which deprived RMA of the benefit of its bargain and forms grounds for rescission of the Warranty.[5]

Pleading failure to warn, RMA states that, prior to the purchase of the Grinder on May 23, 2006, "Peterson was aware that the Grinder operated in a defective manner when used with heavy loads and wet materials but failed to warn Pioneer of this defect and the cure therefor and failed to instruct Pioneer to warn its prospective purchasers of the defect prior to RMA's purchase." RMA contends that Peterson had a duty to notify RMA or Pioneer of the defect, and that the "failure to do so constitutes actionable negligence." Plaintiff maintains that "[t]he delay between Peterson's discovery of the defect and when it finally notified Pioneer, in direct response to an inquiry by Pioneer, was the primary and proximate cause of" RMA's loss and damages.

RMA seeks punitive damages against Peterson in the amount of $1,000,000.00. Asserting a separate count in the complaint, RMA states that Peterson "should be held liable to RMA for punitive and exemplary damages" because Peterson's failure to notify RMA of the defect "when Peterson possessed the means with which to cure the defect" and "Pioneer knew RMA was losing profitable contracts, constitutes willful, wanton and reckless disregard of the rights of RMA and the consequences to RMA of Peterson's actions. . . ."

---

[5] RMA adds that, because it "was largely unable to use the Grinder, it was unable to make the financing payments on it and it was repossessed and sold by the finance company," although "RMA gave Peterson timely notice of the repossession of the Grinder, but Peterson took no action to prevent the sale by the finance company." Plaintiff states that, "[i]n order to place it in the position it was in prior to the purchase, RMA is entitled to recover the payments it made on the Grinder plus the amount of the deficiency between the repossession sale price and the amount financed and all sums owed to the financing company for costs of collection and fees."

## II. Discussion

### A.

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986).

Peterson contends that "[a]ll of RMA's claims are based on the single premise that the RMA Recycler was 'defective', [*sic*, punct.] because the discharge conveyor fitted with the standard Char-Lynn motor to drive it was 'under powered' and therefore subject to stalling under heavy loads." Peterson contends that RMA "[i]ronically . . . concedes that Recyclers like the one at issue can be stalled under a heavy enough load and all parties note that the performance of the machine will be affected by the size, weight and volume of material being fed to the machine, among other factors." Peterson adds the following: "Noticeably absent from Plaintiff RMA's proof in this case is any expert testimony supporting its claims and any explanation as to how RMA has any cause of action when Peterson honored its Limited Warranty, though expired, and provided RMA with an upgrade but that [*sic*] RMA concedes was a satisfactory response to its concerns." In Peterson's view, "[u]nder Virginia law, Plaintiff cannot prevail on the new claims it raises against Peterson in its Amended Complaint, as those claims have no basis in law or fact."

Peterson claims that it did not learn of RMA's difficulties with the Grinder until the summer of 2007, at which time it promptly furnished parts and service. RMA contends that its evidence indicates that it notified Peterson, both actually and constructively, immediately after

the purchase and throughout the next 15 months. Peterson denies that any defect exists in the discharge conveyor system; RMA contends that its evidence suggests that Peterson may have recognized a defect, and that Peterson breached its warranty by failing to timely address the defect.

## B.

Peterson contends that RMA's claim for breach of express warranty fails because there was no defect in the Grinder, and even if there had been a defect, Peterson honored the terms of its express warranty. Because the evidence indicates that Peterson honored the terms of its express warranty, and that there was no breach, I will grant Peterson's motion for summary judgment as to RMA's claim for breach of express warranty.

Peterson contends that there is no evidence of a defect in the Grinder, and thus RMA cannot prove that there was a defect in the 6700B that it purchased. Peterson also contends that RMA has not produced expert testimony of a defect. However, RMA need not independently demonstrate the existence of a design defect to withstand summary judgment on a claim for breach of express warranty; it would be sufficient to show that Peterson acknowledged a defect that it chose not to correct on RMA's machine, because Peterson's alleged decision not to provide parts and service to correct a defect it had identified would constitute a breach of

warranty claim under Virginia law.[6] *See, e.g., Wal-Mart Stores, Inc. v. J.A. Fielden Co., Inc.,* 440 F. Supp. 2d 523, 525 (W.D. Va. 2006); *Hubbard v. Dresser,* 271 Va. 117, 123-24 (2006).

Nonetheless, the evidence submitted in this case discloses that Peterson met and exceeded its contractual obligations under the Limited Warranty, which provides, in pertinent part:

---

[6] Relegating to a footnote its argument that expert testimony is necessary to show that the manufacture of the Grinder with an underpowered discharge motor made the Grinder defective, Peterson acknowledges that, "this is a commercial case, not one alleging strict liability or negligence in a personal injury context," but contends that "the premise that the Virginia courts have uniformly acknowledged is that when a design defect is alleged, expert testimony should be required, and should also apply in this setting as a matter of common sense." However, there are no counts alleging a design defect in this case; although a corrected defect or deficiency in the Grinder or its performance is alleged, this particular count alleges a breach of an express warranty. Moreover, Peterson's argument is not a correct or complete summation of the law regarding design defect. Peterson cites two different kinds of cases for the proposition that expert testimony is necessary to show that the defect was the proximate cause of the injury. The first include drug and medical device cases, where expert medical testimony is necessary to show that the particular defect, like the inclusion of an impurity in a drug, was the proximate cause of the health injury suffered by the user. *See, e.g., Wright v. Eli Lilly & Co.,* 2004 Va. Cir. LEXIS 316. In these cases, expert medical testimony is necessary to show causation, because the interactions involved are beyond the understanding of the lay witness. Peterson then cites to a number of other defect cases, which simply stand for the proposition that "where there is more than one possible cause of an injury, the plaintiff must show, with 'reasonable certainty,' [citation omitted], that the defendant caused the injury." *Stokes v. L. Geismar, S.A.,* 815 F. Supp. 904, 908 (E.D. Va. 1993) (plaintiff's case failed because he was unable to produce any eyewitnesses to the accident, nor provide any testimony as to the condition of the allegedly defective saw at the time of the accident).

Peterson contends that RMA is not entitled to the relief it seeks, citing *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 445 (2005), which Peterson paraphrases as follows in its brief in support of its motion for summary judgment: "'A cause of action on an express warranty asks only that a manufacturer make good ...' on its' [*sic*] warranty." However, the quote from *Bates* actually, and correctly, states the following: "But a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Bates* is inapposite to this case, and the quote does not support Peterson's proposition. Damages are available for claims of breach of express warranty. For example, the Uniform Commercial Code as adopted by Virginia, § 8.2-714 states: "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Va. Code Ann. § 8.2-714(2) (2001). Furthermore, "in a proper case any incidental and consequential damages under [§ 8.2-715] may also be recovered." Va. Code Ann. § 8.2-714(3). *See also Kraft Foods North America, Inc. v. Banner Engineering Sales, Inc.,* 446 F. Supp. 2d 551, 572 (E.D. Va. 2006) (recapitulating Virginia law where a buyer has incurred damages as a result of breach of contract with respect to accepted goods). "Damages need not be established with mathematical certainty. Rather, a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Estate of Taylor v. Flair Property Associates,* 248 Va. 410, 414 (1994).

> This Peterson product is warranted to be free from defects in workmanship and materials under normal use and conditions for a period of six (6) months, or 1000 operating hours, or 1000 service meter units, whichever occurs first, from the warranty start date. . . . Should any defect in workmanship or materials be found and reported within the warranty period, Peterson's liability shall be limited to replacement parts and technician service for replacement. . . .

My review of the evidence indicates that the following facts are undisputed. When Pioneer delivered the Recycler to RMA, Rickie Allen signed the above-quoted Limited Warranty Policy, acknowledging its receipt and content.[7] Prior to purchasing the Recycler, RMA engaged in a demonstration of the Recycler. Pioneer's representative, Richard Wiltshire, arranged and was present for the demonstration.[8] During the demonstration, the Recycler "clogged" more than once. Rickie Allen knew that recyclers could clog from time-to-time. Pioneer's Richard Wiltshire testified that it is normal for a recycler to slow down or clog when processing logs. Before making the decision to buy the Peterson Recycler, Rickie Allen obtained, either from Pioneer or Peterson, the phone numbers of two individuals who owned Peterson HC6700B recyclers. Rickie Allen called the owners to discuss the Recycler prior to making the purchase. Those owners told Rickie Allen that they "hadn't had any problems" with the Recycler clogging. After the demonstration, before deciding to purchase the Recycler, Rickie Allen deliberated for a period of time (either one to two days, or one to two weeks) prior to purchasing the Recycler. Before purchasing the Recycler, RMA had in its possession a specification sheet on the Peterson

---

[7] Robin Allen is the President of RMA; Rickie Allen, her husband, runs its operation. The Limited Warranty Policy signed by Rickie Allen provides, "This warranty is expressly in lieu of all other warranties, express or implied, and any implied warranties of merchantability or fitness for a particular purpose are hereby excluded." The Policy was not subsequently modified.

[8] Contrary to Plaintiff's contentions, the weight of the evidence indicates that Peterson employee Joe Jacobsen was not present at the demonstration.

6700B given to it by Pioneer that contained the following statement: "Actual output may vary due to moisture content, material density, material size, support equipment and grate size."

After purchasing the Recycler, RMA used it to complete ten jobs in a two month period of time. In July 2006, RMA contacted Pioneer to say that the discharge conveyor was slowing. In response, a Pioneer representative went out to RMA's job-site to inspect the machine and investigate, but could not make the Recycler's discharge conveyor slow or stall. Pioneer determined that the issue was due to operator error.

In late November or December of 2006, RMA made its second complaint to Pioneer of discharge conveyor slowing. A Pioneer service technician traveled to RMA's job-site, inspected the Recycler, and found a loose wire, which he repaired.

In August of 2007, RMA reported to Pioneer that the Recycler stalled, and Pioneer contacted Peterson and requested assistance concerning RMA's claim of discharge conveyor stalling. Significantly, Peterson had received no complaints or requests for assistance from RMA, or from Pioneer on behalf of RMA, prior to Pioneer's contact in August 2007. In response, Peterson informed Pioneer of TMD 1147, an upgrade kit that could be installed on the RMA machine to replace the standard motor on the discharge conveyor with one with higher torque.[9] Even though the Recycler was outside Peterson's Limited Warranty Policy coverage period, Peterson provided the TMD 1147 upgrade kit to Pioneer at no cost to RMA, and Pioneer installed the kit for RMA, at no cost to RMA.

The evidence indicates that, of the first sixty-six 6700B Recyclers that were produced, all of which had the Char-Lynn discharge conveyor motors, Peterson received complaints of stalling

---

[9] A "TMD," or "temporary manufacturing deviation," represents a special retrofit for a specific purpose and is not a series-wide design change.

regarding only two machines -- RMA's machine and unit 4. It is undisputed that unit 4, the first of these machines, stalled when it was operated above its rated capacity.[10] A conveyor motor upgrade kit -- TMD1147 -- was created to address the unit 4 customer's unique situation. Once Peterson learned from Pioneer that RMA's Recycler stalled, Peterson provided RMA with the TMD1147 kit to upgrade the discharge conveyor motor, at no cost to RMA, for the purpose of modifying the Recycler to met the demands placed upon it. Pursuant to TMD1147, Pioneer fitted the RMA Recycler with the Poclain motor kit on the discharge conveyor; Pioneer also replaced the standard sized filter screen between the grinder and the discharge conveyor with a screen made of smaller openings to reduce the flow of material onto the conveyor.[11]

When Rickie Allen initially reported slowing or stalling of the conveyor to Pioneer, Pioneer could not replicate the problem. No further stalling issues were reported for six months, at which point, Peterson's warranty was at or near expiration. After RMA's second report of slowing or stalling, a Pioneer representative found a loose wire connection, fixed the wire, and again, no stalling or slowing of the discharge conveyor was reported for another six months. By the time RMA made its third claim of alleged slowing or stalling of the discharge conveyor,

_____

[10] Of the first sixty-six machines, the RMA machine and unit 4 are the only ones regarding which Peterson received any information about alleged stalling of the discharge conveyor. Peterson and Pioneer have never been able to confirm that the RMA machine stalled as claimed.

[11] Rickie Allen testified that, thereafter, the Recycler "went on and mostly it did okay." Significantly, Allen acknowledged that he does not know what caused the Recycler to stall; he admits that it could have been due to size of the discharge conveyor motor, or to the size of the grate (also referred to as a filter screen). Allen acknowledged that he knew that when a discharge conveyor is slowing or stalling under heavy loads, the situation can often be remedied by replacing the screen or grate that controls the flow of material, from the grinder to the discharge conveyor, with one having smaller openings that reduce the material flow. This appears to be common knowledge in the industry, as evidenced by Peterson's published literature on the 6700B, which states: "Actual output may vary due to moisture content, material density, material size, support equipment, and grate size." A copy of this material was given to RMA by Pioneer before it purchased the Recycler. The evidence indicates that Allen knew that, when a Recycler's discharge conveyor slows while processing heavy loads, the condition can be remedied by installing a screen or grate with smaller openings upstream of the conveyor, to reduce flow. Allen chose not to install a smaller grate because he did not want to spend the $8,000.00 it would have cost.

Peterson's warranty had expired. Nevertheless, for customer relations purposes, when notified by Pioneer of the claimed stalling, and in an effort to help RMA "soup up" its machine to deal with heavy loads, Peterson provided the TMD 1147 motor upgrade kit to Pioneer and RMA at no cost.[12]

In sum, the evidence summarized herein discloses no conduct on Peterson's part that could reasonably be construed as a breach of an express warranty. In fact, the evidence indicates that, after the expiration of the Warranty period, RMA was extended, at no cost, the only remedy it would have been entitled to under the Warranty. No further recovery is available or warranted. Accordingly, I will grant Peterson's motion for summary judgment as to RMA's claim for breach of express warranty.

## C.

I will grant summary judgment in favor of Peterson as to RMA's claim of rescission. Plaintiff does not seek rescission as a remedy, but pleads it as a separate count, stating that,

> [i]n order to place it in the position it was in prior to the purchase, RMA is entitled to recover the payments it made on the Grinder plus the amount of the deficiency between the repossession sale price and the amount financed and all sums owed to the financing company for costs of collection and fees.

Rescission is a remedy that would entail unwinding the transaction by allowing Plaintiff to return the Grinder for a refund of the sale price; this, however, is an impossibility.[13]

---

[12] To be sure, Peterson began, in December 2006, to install the Poclain motor on new production models of the 6700B Recycler. The evidence indicates that this modification resolved warranty claims regarding leaking seals on the Char-Lynn motor; the evidence does not support Plaintiff's speculation that the modification was intended to resolve claims of discharge conveyor performance, slowing, or stalling. "[U]nsupported. . . . speculation is not sufficient to defeat a summary judgment motion." *Ash v. UPS*, 800 F.2d 409, 411-12 (4th Cir. 1986) (citation omitted). Nor can the nonmoving party "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

[13] In its response to Peterson's motion for summary judgment, RMA states that its count for rescission is "based
(continued...)

Additionally, RMA has not cited any legal authority that would permit it to obtain rescission under these circumstances.[14]

Assuming, *arguendo*, that there is privity of contract between the parties, and that Peterson's alleged failure to timely repair the alleged defect constitutes a failure of consideration, the following facts remain. The parties are not capable of being returned to the status quo. RMA used the allegedly-defective Grinder after purchasing it, and eventually used the Grinder in a non-defective state after the TMD1147 upgrade. Essentially, RMA seeks to rescind part of the purchase agreement with Pioneer, of which the Limited Warranty forms a part, while leaving the remainder of the contractual obligations in operation. Virginia law does not permit a party to rescind part of a contract, while leaving the remainder in operation. *See Abateco Services, Inc. v. Bell*, 23 Va. App. 504, 518 (1996) ("A party 'cannot accept the benefits of the contract and then assert he is entitled to be relieved of its obligations'") (citations omitted); *Dobie v. Sears, Roebuck & Co.*, 164 Va. 464, 470 (1935) (if a party "treats the contract as a subsisting obligation and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind"). Plaintiff sought and received the benefits of the Limited Warranty, even afte the expiration of the Limited Warranty period; in other words, there has not

---

[13](...continued)
on fraudulent inducement." I observe that there is no claim for fraudulent inducement against Peterson, and any such claim, had it been pleaded, would likely fail for the reasons stated in my Memorandum Opinion and Order of October 1, 2009, granting summary judgment in favor of defendant Pioneer.

[14] Virginia courts are reluctant to rescind a contract unless the parties can be returned to the status quo, by restoring the parties to their former rights prior to entering into the contract. *Adelman v. Conotti Corp.*, 215 Va. 782, 794 (1975); *Dobie v. Sears, Roebuck & Co.*, 164 Va. 464, 470 (1935).

been a failure of performance sufficient to warrant rescission.[15]    Accordingly, I will grant

Peterson's motion for summary judgment as to RMA's claim for rescission.

## D.

I will grant Peterson's motion for summary judgment as to RMA's failure to warn claim.

As explained in my Memorandum Opinion of October 1, 2009, the economic loss rule applies to

suits for negligence in Virginia.[16]    *See also Redman v. John D. Brush and Co.*, 111 F.3d 1174,

1182 (4th Cir. 1997) (economic loss is one that "flows from the failure of the product to perform

as expected") (citing *Sensenbrenner v. Rust, Orling, & Neale, Architects, Inc.*, 236 Va. 419, 423

(1988)); *Tidewater Beverage Services v. Coca Cola Co.*, 907 F.Supp. 943, 947-48 (E.D. Va.

1995) (the "economic loss doctrine" holds that "if a defendant breaches a duty owed to the

plaintiff only through a contractual agreement, the plaintiff may not recover purely economic

losses in a related tort action against the defendant"); *Waytec Elecs. Corp. v. Rohm & Haas Elec.

Materials, LLC*, 459 F. Supp. 2d 480,491 (W.D. Va. 2006); *Virginia Transformer Corp. v. P. D.

George Co.*, 932 F. Supp. 156, 162-63 (W.D. Va. 1996).   In the instant case, RMA does not

allege or claim any personal injury or injury to property, or any actionable injury that does not

---

[15] Under Virginia law, to rescind a contract, a failure in performance "'must be total or substantial in order to justify rescission.'" *Sternheimer v. Sternheimer*, 208 Va. 89, 97 (1967( (quoting 16 Mich. Jur., Rescission, Cancellation and Reformation, s 15 at p. 147); *see also Bolling v. King Coal Theatres*, 185 Va. 991, 997 (1947) ("if the failure has been partial only and a subsisting executed part performance is in his hands, and there has been no fraud on the part of the other, rescission will not be allowed" (citations omitted)); *Steelman v. Fitzgerald*, 69 Va. Cir. 393 (2005) (to justify rescission, "nonperformance must be total or substantial"). In this case, it appears that, once Pioneer brought RMA's alleged stalling issue to Peterson's attention, Peterson provided the TMD 1147 kit to Pioneer for installation, at no cost to RMA. RMA used the Recycler to complete ten jobs, in a two month period of time, after purchasing the machine. The record indicates that the Grinder worked, even if to an allegedly unsatisfying level, every day during the week following the purchase of it. RMA tested the machine before purchasing it, and Mr. Allen saw that it could stall, but he still purchased it. There was not a failure of consideration sufficient to warrant rescission under Virginia law.

[16] In its response to Peterson's motion for summary judgment, RMA acknowledges that, in Virginia, the economic loss rule applies in negligence suits.

flow from the alleged breach of warranty. Accordingly, I will grant Peterson's motion as to RMA's failure to warn claim.

**E.**

I will grant Peterson's motion for summary judgment as to RMA's stand-alone punitive damages claim. In the first instance, a prayer for punitive damages is not a "stand alone" claim under Virginia law. *See Zedd v. Jenkins*, 194 Va. 704, 706-07 (1953) (in order to maintain an action for punitive or exemplary damages, a finding of compensatory damages is a prerequisite) (citations omitted); *Evans v. Newport News Shipbuilding & Dry Dock Co.*, 243 F. Supp. 1017, 1019-20 (E.D. Va. 1965) (same, citing *Zedd*). Moreover, punitive damages fall solely within the realm of tort actions, and cannot be maintained in cases for breach of contract, absent allegations and proof of oppression, wantonness or malice. 5C Mich. Jur., Damages, § 65. And, in tort cases, punitive damages are not permitted for purposes of compensating a plaintiff's loss, but to "warn others and to punish the wrongdoer, if he has acted wantonly, oppressively or with such malice as to evince a spirit of malice or criminal indifference to civil obligations." *Giant of Virginia v. Pigg*, 207 Va. 679, 685-86 (1967). Furthermore, "[a]ctual malice is an essential and controlling factor for the recovery of punitive damages. Evil intent cannot be presumed or inferred from mere mistake." *Id.* Black's Law Dictionary defines "actual malice" as "[t]he deliberate intent to commit an injury, as evidenced by external circumstances." Black's Law Dictionary (9th ed. 2009). Moreover, "[w]illful or wanton conduct imports knowledge and consciousness that injury will result from the act done." *Wallen v. Allen*, 343 S.E.2d 73 (Va. 1986). Here, RMA has no cognizable tort claim against Peterson, nor does any evidence suggest, much less prove, that Peterson was oppressive or acted with wantonness or malice in selling the Grinder at issue to Pioneer, who in turn sold it to RMA. RMA has not alleged

conduct on Peterson's part that rises to the level required under Virginia law to warrant punitive damages.

### III. CONCLUSION

For the heretofore stated reasons, Peterson's motions for summary judgment (docket nos. 41 and 82) will be granted, and this case will be stricken from the active docket of the Court.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this _19th_ day of November, 2009.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE